## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOTHAR E.S. BUDIKE, SR., ALEXANDRA | : | |
| BUDIKE, & A-VALEY ENGINEERS, INC. | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | NO.  11-4639 |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                November 30, 2011

Currently pending before the Court is the Motion of Defendant United States of America to Dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction.  For the following reasons, the Motion is granted.

## I.      FACTUAL AND PROCEDURAL HISTORY

According to the facts set forth in the Complaint, Plaintiffs Lothar E.S. Budike, Sr. and Alexandra Budike are husband and wife.  (Compl. ¶¶ 9-10.)  Mr. Budike is President of Plaintiff A-Valey Engineers, Inc. ("A-Valey"), a multi-discipline engineering and consulting firm, while Mrs. Budike is the Secretary of A-Valey.  (Id.)  In April 2000, the Budikes were notified by the IRS, located in Media, Pennsylvania, that their company A-Valey was going to be audited for the fiscal year 1999.  (Id. ¶ 13.)  Shortly thereafter, they received a follow-up correspondence stating that IRS agent John L. Vastardis would be performing the audit.  (Id. ¶ 14.)  From the onset of the audit, Mr. Budike sought a conference meeting with an IRS supervisor to request that Agent Vastardis be removed from the process due to a conflict of interest.  (Id. ¶¶ 16-17.)  Specifically, Mr. Budike

noted that Agent Vastardis, the Budikes, and the Budikes' accountant for the past forty-five years (Lazarus P. Kirfides), were all members of the same Greek Church and community and had been so for many years.  (Id. ¶ 18.)  Moreover, Mr. Budike, as a professional engineer and owner of A-Valey, worked and performed as the engineer of record on numerous construction projects in which Agent Vastardis's father was employed as a contractor.  (Id. ¶ 19.)  Finally, Agent Vastardis's father and Mr. Budike were investors/business partners on a failed housing development project in Pleasantville, NJ, in which Mr. Budike and Agent Vastardis's father both lost a substantial amount of money.  (Id. ¶ 20.)  Mr. Budike was blamed by the Vastardis family for their financial loss.  (Id.).  Despite Mr. Budike's request, however, he was never afforded a conference with a supervisor.  (Id. ¶ 16.)

In June 2000, Mr. Budike received a follow-up correspondence from the IRS outlining the procedures for the upcoming audit and requesting certain documents.  (Id. ¶ 21.)  Mr. Budike complied and turned over all personal and corporate bank statements, including a special bank account for long-term projects and the U.S. Department of Commerce Overseas Balkan States Project.  (Id. ¶ 22.)  Due to the sensitive nature of the latter operation, which was gathering criminal information against certain Greek citizens who were covertly operating within Greek communities in the United States, Mr. Budike's attorney, Kirk Karaszkiewicz, decided that the audit should be performed at his Philadelphia, Pennsylvania office.  (Id. ¶¶ 23-24.)  Mr. Karaskiewicz also decided to bar accountant Lazarus Kirfides from the audit process because of his relationship with certain Greek companies that were the target of the criminal investigation.  (Id. ¶ 25.)

During the course of the audit process, Agent Vastardis called Mr. Budike and requested a private meeting at his Media, PA office.  (Id. ¶ 27.)  At that time, Agent Vastardis indicated that he needed to come to A-Valey's New Jersey Corporate Office facility to inspect company trucks and equipment, and that it was unnecessary for Mr. Budike's attorney or accountant to be present.  (Id.)

Mr. Budike again requested a conference meeting with Agent Vastardis's supervisor, but was again denied. (Id. ¶ 28.) During the subsequent audit process at the New Jersey facility, Agent Vastardis searched all the vehicles, as well as the storage bins in the shop and the kitchen cabinet areas, and confiscated paperwork. (Id. ¶¶ 29-31.) He also asked several employees personal questions regarding the Budike family, none of which had anything to do with their business affairs. (Id. ¶ 32.)

Thereafter, Agent Vastardis stated to Mr. Budike that he needed to audit the books of his daughter's company, named General Contracting, Inc., and his son's company, named Powerweb Technologies, Inc. ("Powerweb"), in order to complete his audit. (Id. ¶ 33.) Both the son and daughter maintained an office at the New Jersey Corporate Office facility. (Id.) Mr. Budike's daughter immediately turned over her corporate books, while Mr. Budike's son issued an opinion letter through his Accountant refusing to turn over his books and income tax returns. (Id. ¶¶ 34-35.) He further wrote that the IRS had no legal rights to Powerweb's books because it was not the subject of the audit. (Id. ¶ 35.) At the insistence of Agent Vastardis, however, Powerweb's books, which included a confidential listing of Powerweb's stockholders and their social security numbers, were physically taken without the authorization of either Mr. Budike or his son. (Id. ¶ 37.)

On September 16, 2007, Agent Vastardis and Mr. Budike's son were invited to an intimate dinner engagement by a mutual friend. (Id. ¶ 38.) During this dinner, Agent Vastardis told Mr. Budike's son that if he ever encountered a problem with the IRS that he could intervene on his behalf and have the problem corrected. (Id. ¶ 39.) The son informed his father of this encounter and Mr. Budike, in turn, viewed this as either extortion or an attempt to entrap the Budikes in a bribery/sting operation. (Id. ¶ 40.) As such, Mr. Budike reported this incident to the proper authorities within the IRS. (Id. ¶ 41.) Subsequently, Mr. Budike's son was served with an official IRS letter that he was going to be audited. (Id. ¶ 42.)

3

As a purported result of the pressure from the audits, Mr. Budike lapsed into a long-term illness and battle with depression, where he was admitted to a mental hospital. (Id. ¶ 43.) The inspection and audit was postponed for several months as Mr. Budike was not able to fulfill his personal and business obligations. (Id.) Prior to his full recovery, Agent Vastardis contacted him to state that he was being pressured by his supervisor to conclude his audit. (Id. ¶ 44.) While still under his doctor's care and heavy medication, Mr. Budike returned to the office to complete the audit. (Id.)

At the completion of the audit, Agent Vastardis personally contacted Mr. Budike via telephone so he could go over the outcome. Shortly thereafter, a letter from the IRS arrived indicating that the Budikes were deficient in their reported income and that the Budikes and A-Valey were levied additional taxes, penalties, and interest in excess of $3 million dollars. (Id. ¶ 47). Mr. Budike believes that Agent Vastardis had made false, misleading, and ambiguous statements during the course of the audit and purposefully retaliated against the Budikes for the failed investment of Agent Vastardis's father. (Id. ¶ 48.) The case has been in dispute since its inception in 2001, and, to date, remains unresolved. (Id. ¶ 50.)

In 2008, the Budike family was finally afforded an opportunity to meet with IRS Appeals Officer David Rollins concerning the audit. (Id. ¶ 51.) Plaintiffs allege that Mr. Rollins and IRS Counsel Tom Rath's inability to remember stipulations, understandings, and agreements prevented the matter from being amicably and timely resolved. (Id. ¶ 53.) Ultimately, the Budikes agreed to settle the matter for $300,000 in order to proceed to federal court for a proper determination. (Id. ¶ 54.) The IRS, however, assessed them additional penalties and interest in the amount of $300,000, bringing the total assessed liability and obligation to $600,000. (Id. ¶ 55.)

On February 2, 2009, IRS Revenue Officer Henry Kline arrived unannounced at the Budikes' home office in Wallingford, Pennsylvania. (Id. ¶ 56.) Mr. Kline spoke with Mrs. Budike

and threatened her by stating that they owed the IRS in excess of $400,0000 and had five days to make the required payment or face seizure of their assets.  (Id. ¶ 56.)  Mr. Budikes' personal representative, Reverend Duane A. Quamina, then called Mr. Kline to find out the purpose of his visit.  (Id. ¶ 57.)  Rev. Quamina explained that the Budikes were in the process of appealing the interest and penalties, and Mr. Kline responded that the Budikes needed to file a "Reasonable Cause Letter" sent to his attention instead of the IRS form 843 "Claim for Refund and Request for Abatement," which the Budikes had already prepared.  (Id.)

On February 9, 2009, Mr. Budike met with Mr. Kline at his office, at which time Mr. Kline told Mr. Budike that they had no right to appeal and admonished him not to file IRS Form 433-B, apply for installment payments, or file IRS Form 843.  (Id. ¶ 58.)  He further told Mr. Budike that he must pay the assessed penalties before the IRS would consider his abatement request, but that, in his thirty years with the IRS, he had never seen the IRS abate anyone's interest or penalty.  (Id. ¶ 58.) Subsequently, on February 17, 2009, Mr. Kline told Mr. Budike to come to his office and bring three separate checks in the amounts of $14,741, $4,242, and $2,422.  (Id. ¶ 59.)  Moreover, Mr. Kline stated that if Mr. Budike complied, he would ask his boss to give Mr. Budike an additional five to ten days to make payment in full, but if he did not comply, he would immediately file a levy and lien against the Budikes and seize their assets.  (Id. ¶ 59).  Then, on February 17, 2009, Mr. Kline wrote to the Budikes stating that he had conferred with IRS District Counsel and was advised that they had availed themselves of all appeal rights and "waived the restrictions contained in I.R.C. 6213(a) prohibiting assessment and collection of the deficiencies and penalty (plus statutory interest)."  (Id. ¶ 60.)  On February 23, 2009 and March 11, 2009, Mr. Budike wrote back to Mr. Kline outlining his complete dissatisfaction with the IRS and asking him to provide the name of the District Counsel Attorney.  (Id. ¶¶ 61-62.)  Mr. Kline never responded.   (Id. ¶ 63)

In April 2009, the Budikes filed with the IRS a timely request for a Collection Due Process

Hearing for the taxable years 1998, 1999, and 2000, in order to appeal the penalties and interest assessed against them.  (Id. ¶ 64.)  IRS Appeals Officer Darryl Lee received Plaintiffs' first offer-in-compromise on April 30, 2009, reflecting an offer of $27,000.  (Id. ¶ 65.)  On July 10, 2009, a collection due process hearing was held with the IRS Office of Appeals, but Officer Lee refused to consider Plaintiffs' claim for interest and penalty abatement.  (Id. ¶ 67.)  Officer Lee further determined that the Budikes did not submit a reasonable offer because A-Valey's 2007 income tax return reported loans to shareholders in the amount of $443,000, which would pay in full the liability owed to the IRS.  (Id.)  By way of Notice of Determination issued on July 10, 2009, the IRS Office of Appeals rejected the first offer-in-compromise.  (Id. ¶ 70.)  Prior to receiving this rejection notice, however, the Budikes had already paid $10,950 under the provisions of the first-offer-in-compromise, but immediately ceased paying the $1,800 required monthly obligation upon receipt of the notice.  (Id.)

On July 27, 2009, the Budikes filed a Petition with the U.S. Tax Court for Lien or Levy Action under Code Section 6320(c) or 6330(d), alleging that: (1) the IRS erred because IRS Appeals Officer Darryl Lee did not abate the penalties; (2) the IRS erred because Mr. Lee did not abate the interest; and (3) Mr. Lee abused his discretion in handling the first offer-in-compromise.  (Id. ¶ 71.)  The U.S. Tax Court agreed in part and, on November 16, 2009, remanded the case back to the IRS Office of Appeals for due consideration of the interest and penalty abatement.  (Id. ¶ 73.)

The IRS Office in Holtsville, New York received a second offer-in-compromise from the Budikes in the amount of $18,000, on December 12, 2009.  (Id. ¶ 75.)  This offer-in-compromise allowed for a 20% down payment and called for the balance to be paid out over twelve months.  (Id.)  The Budikes were told by the IRS that a decision on that offer-in-compromise would be forthcoming by January 26, 2010.  (Id. ¶ 76.)  Thereafter, on March 3, 2010, IRS Appeals Officer Darryl Lee met with Mr. Budike to consider the interest and penalty abatement issue as directed by

the U.S. Tax Court.  (Id. ¶ 77.)  During that meeting, Mr. Lee ignored the second offer-in-compromise.  (Id.)  When the Budike's representative called the IRS office on March 9, 2010 to find out the status of the second offer-in-compromise, a Ms. Belinda Gonzalas-Allen informed him that it had not been processed because it was pulled from consideration by Darryl Lee.  (Id. ¶ 78.)  On March 10, 2010, the IRS Office of Appeals issued a Supplemental Notice of Determination Concerning Collection Action denying the Budike's request for interest and penalties abatement with no mention of the second offer-in-compromise.  (Id.)  On October 1, 2010, the Budikes completed paying their entire obligation under the provisions of the second offer-in-compromise — a total of $18,150 — to the IRS.  (Id. ¶ 80.)  At that juncture, they had paid a grand total of $29,100 under the two offers-in-compromise.  (Id.)

Mr. Budike and his attorney, Shelley C. Dugan, met with IRS Counsel Harry Negro, on December 22, 2010, to discuss the upcoming Tax Court case.  (Id. ¶ 81.)  When pressed about the second offer-in-compromise, Mr. Negro indicated that he did not know about it, but would try to contact the responsible person to inquire about its status.  (Id. ¶¶ 81-82.)  Mr. Negro also remarked that if the OIC Office reviewed and accepted the second offer-in-compromise, there would be no need to continue with the IRS Tax Court case.  (Id. ¶ 83.)

In January 2011, Mr. Negro called Attorney Dugan to explain that IRS Appeals Officer Darryl Lee refused to consider the second offer-in-compromise or to release the offer so that it could be reviewed and processed by someone in the OIC Office.  (Id. ¶ 84.)  The Budikes' representative followed up and learned that the second offer-in-compromise was not logged into the official OIC computer database and was still missing.  (Id.)

On January 18, 2011, Ms. Dugan received from Mr. Negro the IRS's stipulation of facts, in which Mr. Negro objected to the admission of the second offer-in-compromise and the "amended federal income tax return" for the taxable year ending September 30, 2008, on the grounds that these

documents were not part of the IRS administrative record.  (Id. ¶ 86.)  Ms. Dugan contacted Mr.

Negro the same day to apprise him of Mr. Budike's objection to his objection, especially since the

circumstances had been fully explained to Mr. Negro by both Mr. Budike and Ms. Dugan at the

December 22, 2010 meeting.  (Id. ¶ 87.)  The U.S. Tax Court granted Mr. Budike's motion on

January 25, 2011, and remanded the case back to the IRS Office of Appeals to consider the second

offer-in-compromise.  (Id. ¶ 89.)

On April 4, 2011, IRS Appeals Officer, Ms. Florence Mathis — located in the same office as

Darryl Lee — contacted Mr. Budike and requested that he resubmit entirely new information.  (Id. ¶

90.)  Attorney Dugan responded to this letter and asked that Ms. Mathis refrain from personally

contacting Mr. Budike.  (Id. ¶ 91.)  She also stated that the IRS had in its files the information that

the IRS Tax Court remanded for review and processing.  (Id.)  Mr. Budike and Attorney Dugan had

a telephone conference call with Ms. Mathis on April 14, 2011, to discuss the second offer-in-

compromise.  (Id. ¶ 92.)  Nonetheless, in May 2011, the IRS Office of Appeals issued the Budikes a

Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330 rejecting

the second offer-in-compromise.  (Id. ¶ 93.)

Plaintiffs initiated the present litigation in this Court against Defendant United States of

America on July 22, 2011.  The Complaint alleged a Federal Tort Claims Act violation, as well as

abuse of discretion actions with respect to IRS employees John Vastardis, Henry Kline, Darryl Lee,

David Rollins, and Florence Mathis.  (Id. ¶¶ 106-122.)  On September 26, 2011, Defendant filed the

present Motion to Dismiss and Plaintiffs responded on October 12, 2011, making the Motion ripe

for judicial review.

## II.      STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the power of a federal court to

hear a claim or a case.  Gould Elecs., Inc. v. United States, 200 F.3d 169, 178 (3d Cir. 2000).  When

presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006), cert. denied, 127 S. Ct. 2098 (2007).  There are two types of Rule 12(b)(1) motions.  A "facial" attack assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction.  Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  If the complaint is deficient as pled, the court should grant leave to amend before dismissing it with prejudice.  Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).  The motion should only be granted if it appears with certainty that assertion of jurisdiction would be improper. Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).

The second form of a Rule 12(b)(1) motion is a "factual" attack, which argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue thereby causing the case to fall outside the court's jurisdiction.  Mortenson, 549 F.2d at 891.  In such a case, the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue.  Id.; Carpet Grp., 227 F.3d at 69.

In the present matter, the Defendant's style their challenge to the Complaint as a "facial attack" on subject matter jurisdiction.  As such, the Court applies the first of the two aforementioned standards.

III.    DISCUSSION

Defendant argues that the Court has no subject-matter jurisdiction over this case under the doctrine of sovereign immunity.  It asserts that because the claims at issue fall precisely within the exception at Section 2680(c) of the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., the entire Complaint must be dismissed.

It remains well settled that the United States enjoys sovereign immunity from suits and, accordingly, may be sued only if it has waived that immunity.  Beneficial Consumer Disc. Co. v.

Poltonowicz, 47 F.3d 91, 93-94 (3d Cir. 1995). "The IRS, as an agency of the United States, is thus shielded from private actions unless sovereign immunity has been waived." Id. (citing United States v. Mitchell, 463 U.S. 206, 212 (1983)). "[W]aivers of federal sovereign immunity must be 'unequivocally expressed' " in the statutory text and "'[a]ny such waiver must be strictly construed in favor of the United States.'" United States v. Idaho ex rel. Director, Idaho Dep't. of Water Res., 508 U.S. 1, 7 (1993) (quotations omitted).

One type of waiver is found within the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. Matsko v. United States, 372 F.3d 556, 558 (3d Cir. 2004). The Act "waives sovereign immunity as to claims against the United States for money damages for injury caused by the negligent or wrongful act or omission of a government employee acting within the scope of his employment 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" Beneficial, 47 F.3d at 95-96 (citing 28 U.S.C. § 1346(b)). "The FTCA does not, however, provide a blanket license to sue the Government. This waiver of sovereign immunity is conditional and limited and depends upon compliance with certain procedural limitations and exceptions." Abuhouran v. United States, 595 F. Supp. 2d 588, 592 (E.D. Pa. 2009), aff'd, 389 Fed. Appx. 179 (3d Cir. 2010). Section 2680 of the FTCA enumerates a series of such exceptions. More specifically, § 2680(c) states that the United States does not waive sovereign immunity with respect to:

> Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer, except that the provisions of this chapter and section 1346(b) of this title apply to any claim based on injury or loss of goods, merchandise, or other property, while in the possession of any officer of customs or excise or any other law enforcement officer, if –
>
>> (1)  the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other

than as a sentence imposed upon conviction of a criminal offense;

(2)  the interest of the claimant was not forfeited;

(3)  the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and

(4)  the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law.

28 U.S.C. § 2680(c).  Pursuant to this provision,  "[i]t is well established that the United States cannot be sued in tort for actions relating to the assessment and collection of taxes because it has not waived its sovereign immunity."  Barnard v. Pavlish, No. Civ.A.97-236, 1998 WL 247768, at *6 (M.D. Pa. Mar. 30, 1998) (citations omitted), aff'd, 187 F.3d 625 (3d Cir. 1999); see also Lichtman v. United States, 316 Fed. Appx. 116, 120 (3d Cir. 2008) (finding that claims against the United States arising in respect to the assessment or collection of any tax are barred from suit); Asemani v. I.R.S., 163 Fed. Appx. 102, 105 (3d Cir. 2006) (holding that action against United States regarding an alleged improper rejection of an offer-in-compromise fell within Federal Tort Claims Act and, thus, was barred by sovereign immunity); Hart v. United States, No. Civ.A.96-5639, 1997 WL 732466, at *2 (E.D. Pa. Nov. 21, 1997) (holding that to the extent wrongful tax assessment or collection is at issue, there is a lack of subject matter jurisdiction since § 2680(c) expressly bars such claims against the government), aff'd, 178 F.3d 1279 (3d Cir. 1999); Goldberg v. Comm'r of Internal Revenue, No. Civ.A.05-4777, 2006 WL 1767321, at *4 (D.N.J. May 3, 2006) ("While the United States has waived its sovereign immunity for certain tort claims under the Federal Tort Claims Act . . . it has not waived its sovereign immunity for common law torts allegedly committed by the IRS concerning the assessment and collection of taxes.").

The entirety of Plaintiffs' claims, in the present case, are grounded in the alleged tortious conduct of IRS employees engaged in the assessment and/or collection of taxes.  The Federal Tort

Claims Act explicitly declines to waive the sovereign immunity of the United States with respect to such actions. As such, this Court does not maintain subject matter jurisdiction over the present Complaint.

Plaintiffs' Response Brief fails to directly address this argument, but instead contends that the claims are specifically allowed under Section 2680(a) of the Federal Tort Claims Act. This Section states that the United States does *not* waive its sovereign immunity with respect to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The purpose of the discretionary function exception is to avoid 'judicial second-guessing of legislative and administrative decisions that are grounded in social, economic, and political policies.'" Abuhouran, 595 F. Supp. 2d at 592 (internal quotations omitted). Plaintiffs assert that because, under 5 C.F.R. § 2635.501, the IRS agent involved had a prescribed regulatory course of action to follow, the discretionary function exception does not apply. (Pls.' Resp. Mot. Dismiss 6.)

Assuming, without deciding, that Plaintiffs' argument is correct and that their claims do not fall within the discretionary function exception to the FTCA, however, Plaintiffs still fail to explain how their claims escape the clear exception under Section 2680(c). In other words, if any one of the exceptions of Section 2680 applies, then the bar of sovereign immunity remains. Perez v. United States, No. Civ.A.06-1508, 2007 WL 1489816, at *1 (D.N.J. May 21, 2007). While the allegations of the Complaint suggest that Plaintiffs may have been the target of some arbitrary agency action, Congress has simply not authorized an action against the United States on such grounds. Moreover, the Court cannot conceive of — and Plaintiffs have not suggested — any amendment to the Complaint that would cure this deficiency. Accordingly, the Court grants Defendant's Motion and

dismisses the Complaint in its entirety.[1]

---

[1] Defendant also argues that Plaintiffs' claims are time-barred.  Absent subject-matter jurisdiction over this case, the Court cannot and need not rule on this argument.